UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SUZAN RIAZI,                                                    Civil Action No.


                                        Plaintiff,

        -against-                                               **COMPLAINT**

CHRISTIAN DIOR, INC., LVMH MOET
HENNESSY LOUIS VUITTON INC., JANE KIM,
individually, SIMON KENDALL, individually,
CHRISTINA GOULIAMBERIS, individually,
EMMA FOXALL, individually, FELICITY LAY,
individually, DIANA DOLPH, individually,
ALEXANDRA DE RANCOGNE, individually,
and ERICA EIMER, individually.

                                                        Plaintiff Demands a Trial by Jury

                                        Defendants.
-----------------------------------------------------------------------X


Plaintiff, SUZAN RIAZI, (hereinafter referred to as "Plaintiff" or "RIAZI"), by and through

Plaintiff's attorneys, **DEREK SMITH LAW GROUP, PLLC,** as and for Plaintiff's Complaint in

this action against the Defendants, (hereinafter collectively referred to as Defendants), respectfully

alleges as follows upon information and belief:


                                        **NATURE OF CASE**

Plaintiff, SUZAN RIAZI, complains pursuant to the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101 *et. seq* ("ADA"), as amended by the Americans with Disabilities Act Amendments

Act of 2008 ("ADAAA"), the New York State Human Rights Law Executive Law, § 296 *et seq.* (

"NYSHRL"), and the New York City Human Rights Law ("NYCHRL") N.Y.C. Admin. Code

§§8-101 *et seq.*, based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. §1367 seeking declaratory and injunctive relief and damages to redress the injuries that Plaintiff has suffered as a result of, *inter alia*, disability, sex, gender, retaliation, and wrongful termination by Defendants.

## JURISDICTION AND VENUE

1. This Court has jurisdiction based on 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

2. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under the ADA. The Court also has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

3. 28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

4. On or about March 10, 2021, Plaintiff, SUZAN RIAZI, submitted a Complaint to the U.S. Equal Employment Opportunity Commission ("EEOC").   The federal charge number is 520-2021-02124.

5. On or about May 27, 2021, Plaintiff, SUZAN RIAZI, received a Right to Sue Letter from the EEOC for federal charge number 520-2021-02124.

6. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue letter from the EEOC.

7. Venue is proper because the events giving rise to Plaintiff's claims in New York County within the Southern District of New York.

## PARTIES

8.  Plaintiff SUZAN RIAZI (hereinafter referred to as "Plaintiff" and/or "RIAZI") is seeking damages to redress the injuries Plaintiff has suffered as a result of being discriminated against by her employer, *inter alia*, on the basis of her disability, together with being subjected to a hostile work environment, repeated and sustained failure to accommodate reasonable requests related to Plaintiff's disability, retaliation and wrongful termination.

9.  Plaintiff is an individual woman who is a resident of the State of New York, New York County.

10. At all times material, Defendant CHRISTIAN DIOR, INC. (hereinafter referred to as "Christian Dior") is a domestic business corporation duly existing by the virtue and laws of the State of New York that does business in the State of New York.

11. At all times material, Defendant LVMH MOET HENNESSY LOUIS VUITTON INC. (hereinafter referred to as "LVMH") is a domestic business corporation duly existing by the virtue and laws of the State of New York that does business in the State of New York.

12. At all times material, LVMH owns and operates Christian Dior.

13. At all times material, Christian Dior and LVMH were joint employers of Plaintiff (hereinafter collectively referred to as "Defendants").

14. At all times material, Defendant  KIM KIM (hereinafter referred to as "Kim") was and is a Supervisor at Christian Dior who holds the title of Senior Director of CRM. Kim held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Kim held the power to hire and fire Plaintiff.

15. At all times material, Defendant SIMON KENDALL (hereinafter referred to as "Kendall") was the Senior Vice President and now Executive Vice President at Christian Dior. Kendall held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Kendall

held the power to hire and fire Plaintiff.

16. At all times material, Defendant CHRISTINA GOULIAMBERIS (hereinafter referred to as "Gouliamberis") was and is the Human Resources Manager at Christian Dior. Gouliamberis held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Gouliamberis held the power to hire and fire Plaintiff.

17. At all times material, Defendant EMMA FOXALL (hereinafter referred to as "Foxall") was and is Manager of Retail Performance at Christian Dior. Lay held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Lay held the power to hire and fire Plaintiff.

18. At all times material, Defendant FELICITY LAY (hereinafter referred to as "Lay") was and is Director at Christian Dior. Lay held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Lay held the power to hire and fire Plaintiff.

19. At all times material, Defendant DIANA DOLPH (hereinafter referred to as "Dolph") was and is Director of Talent Development at Christian Dior. Dolph held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Dolph held the power to hire and fire Plaintiff.

20. At all times material, Defendant ALEXANDRA DE RANCOGNE (hereinafter referred to as "De Rancogne") was and is the Vice President of Human Resources at Christian Dior. De Rancogne held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. De Rancogne held the power to hire and fire Plaintiff.

21. At all times material, Defendant ERICA EIMER (hereinafter referred to as "Eimer") was and is the Senior Director of Human Resources at Christian Dior. Eimer held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Eimer held the power to hire and fire Plaintiff.

22. At all times material, CEDRENA DAVIS (hereinafter referred to as "Davis") was and is a contact in the Human Resources Department at Christian Dior. Davis held supervisory authority over Plaintiff, controlling many of Plaintiff's job duties. Davis held the power to hire and fire Plaintiff.

## MATERIAL FACTS

23. In around July 2019, Plaintiff began treatment and came under the care of both of her treating health and mental health providers, Dr. Cory Frank and Dr. Michelle Cervone, due to workplace issues caused by Supervisor Defendant KIM's abusive behavior aggravating Plaintiff's clinical mental health disability. Dr. Cervone prescribed Plaintiff medication for anxiety and panic attacks caused and exacerbated by Defendant KIM's unnecessarily abusive and demeaning treatment of Plaintiff.

24. Around November 20, 2019, Plaintiff attended a scheduled one-on-one meeting with Defendant KENDALL, who held the title of Senior Vice President, at the time, where they discussed Plaintiff's goals within the company and her role. Plaintiff mentioned to KENDALL her issues with Defendant KIM's abusive and demeaning behavior, and that behavior's impact on Plaintiff's disability.

25. In or around January 2020, after berating Plaintiff, Defendant KIM told Plaintiff "THIS IS THE LAST CONVERSATION."

26. In or around January 2020, treating medical provider, Dr. Frank told Plaintiff that it was likely she suffered from ADHD, however at that time it was not yet diagnosed.

27. Shortly thereafter, After Supervisor KIM aggressively reprimanded Plaintiff, Plaintiff had to schedule an emergency appointment with her treating board-certified psychiatrist, Dr. Cervone.

28. Dr. Cervone evaluated Plaintiff and confirmed the diagnosis of ADHD. Further, Dr. Cervone prescribed medication and counseled her on the possibility of "WORKPLACE ACCOMODATIONS."

29. In or around January 2020, Plaintiff went back to see Dr. Frank who further explained to her the diagnosis, the effects of the disability and the impact it had and will have on her day-to-day functioning. Moreover, Dr. Frank opined that Plaintiff should inform her Supervisor, Defendant KIM.

30. In or around January 2020, Plaintiff informed Defendant KIM that Plaintiff was diagnosed with ADHD. Plaintiff mentioned that she needed to address the necessity of workplace accommodations for her ADHD. Plaintiff noted to KIM that she was providing this information to KIM to reassure her that Plaintiff was taking the proper steps to make sure she could continue working provided Defendants grant reasonable accommodations for Plaintiff's newly diagnosed disability. Moreover, Plaintiff told KIM of the direct impact that the disability had on Plaintiff in relation to her work life.

31. Around a month later, in February 2020, Defendant KIM told Plaintiff that even though Plaintiff informed KIM her about her diagnosis to address possible workplace accommodations, KIM told Human Resources about her conversation regarding her diagnosis.

32. Plaintiff was initially distraught and upset that Supervisor KIM told Human Resources about Plaintiff's disability. KIM stated, "I STRUGGLED WITH MY DECISION…HOW COULD I HAVE DONE IT DIFFERENTLY? I MADE A MISTAKE; I CANNOT CHANGE THAT."

33. Plaintiff expressed to KIM that she wished she would have had a chance to tell Human Resources directly instead of KIM violating her trust and breaching protocol.

34. Shortly after, in around February 2020, Plaintiff set up a meeting with Human Resources

Manager GOULIAMBERIS. During this meeting, Plaintiff reported to GOULIAMBERIS that she was taken aback by Derfendant KIM's breach of trust. GOULIAMBERIS responded, "SHE DID THE RIGHT THING, SHE HAS TO PROTECT THE COMPANY." Through tears, Plaintiff could not believe what GOULIAMBERIS had said. Plaintiff informed GOULIAMBERIS how difficult it was to work under Defendant KIM's abuse and hostility.

35. Plaintiff was afraid to say too much to GOULIAMBERIS considering how she had protected and favored KIM and the company over a disabled employee.

36. Plaintiff stated at the end of the meeting, "THE DIAGNOSIS IS RECENT. I AM STILL LEARNING ABOUT THIS DISABILITY AND HOW IT AFFECTS ME. I AM WORKING CLOSELY WITH MY DOCTORS TO UNDERSTAND WHAT WORKPLACE ACCOMODATIONS MIGHT MAKE SENSE."

37. In or around April 2020, Senior Vice President KENDALL conducted a meeting which included Plaintiff and a few of her colleagues. KENDALL informed the staff that because of the pandemic, there will be adjustments made to the schedule but that their salaries would remain full and intact.

38. After the meeting, Plaintiff's coworker asked KIM if they should be putting actual hours on the allotted time sheets or typical 8 hours in the allotted time slot. KIM said, "USE YOUR BEST JUDGMENT."

39. In around May 2020, Plaintiff and other employees were notified that they would be required to take one paid time off day a week, Fridays. Plaintiff confirmed that she worked more than 40 hours weekly, but KIM told her that she would need to use her PTO regardless.

40. On around the following morning, May 12, 2020, Defendant KIM called Plaintiff over the phone and told her that she never told her to work extended hours and asked why her

spreadsheet showed long hours. Plaintiff listed the instances of Defendant KIM demanding that Plaintiff work more than 40 hours. Defendant KIM commented repeatedly, "THAT IS NOT FAIR THAT YOU BRING THAT UP."

41. On around May 27, 2020, Plaintiff met with Manager of Retail Performance Defendant FOXALL for an impromptu meeting. Plaintiff asked FOXALL how would she able to initiate a transfer into a new department under new leadership in light of Defendant KIM's mistreatment of Plaintiff and how it affected her.

42. Plaintiff inquired about joining FOXALL'S team which was led by Director LAY. FOXALL told Plaintiff that she should speak to LAY first before approaching KENDALL.

43. On around June 3, 2020, Plaintiff emailed LAY to request a meeting but did not receive a response. Plaintiff then emailed KENDALL so that she could get a meeting scheduled. KENDALL promptly replied and asked his assistant to set up a meeting with him and Plaintiff.

44. During the meeting Plaintiff raised the issue of Defendant KIM's abusive treatment and failure to engage in an interactive dialogue regarding Plaintiff's disability.  Plaintiff requested a transfer to another team so that she would not be required work under the abusive atmosphere created by KIM, as a reasonable accommodation.

45. Defendant KENDALL remarked to Plaintiff during the meeting, "I SEE A LOT OF PASSION IN YOU, WE NEED TO FIX THIS. I WILL NEED TO HEAR KIM'S SIDE OF THE STORY. WE WILL SPEAK SOON. I APPRECIATE YOUR CANDOR SUZAN, AND YOUR TRANSPARENCY. THANK YOU."

46. On around June 21, 2020, Plaintiff met with LAY and they discussed Plaintiff's particular skill set, education, professional experiences and how her approach would benefit LAY's team. LAY agreed to pitch the idea to KENDALL.

47. Plaintiff requested the transfer as a reasonable accommodation related to her disability.

48. Defendants, including KENDALL never made any substantive efforts to identify any reasonable accommodations or to grant any reasonable accommodations related to Plaintiff's disability.

49. On around June 24, 2020, Plaintiff attended an online meeting that was scheduled. It was supposed to be KIM and Plaintiff, but Human Resources Manager GOULIAMBERIS joined the call. GOULIAMBERIS proceeded to issue Plaintiff a "written warning" which KIM read aloud to Plaintiff from a text of a corrective action form. Plaintiff did not agree with the accusations but GOULIAMBERIS forced her to sign it and send it back to her even if she did not agree with the accusations.

50. On around June 25, 2020, GOULIAMBERIS emailed Plaintiff the written warning which was issued the day before.

51. On around June 26, 2020, Plaintiff exchanged text messages with LAY which confirmed that LAY will discuss the transfer over to her team to KENDALL that following Monday, June 29th.

52. That same day, around June 26, 2020, Plaintiff's treating psychologist Dr. Frank emailed GOULIAMBERIS a signed letter which confirmed Plaintiff's diagnosis and subsequent disability. Further, Dr. Frank confirmed that Plaintiff's disability qualified her for workplace accommodations as per the Americans with Disabilities Act and said that, " I WOULD HOPE THAT KNOWING THAT [PLAINTIFF] HAS A MEDICAL CONDITION THAT COULD IMPACT HER PERFORMANCE AND WITH THE PROPER REASONABLE ACCOMODATIONS SHE COULD SIGNIFICANTLY IMPROVE HER PERFORMANCE…"

53. Plaintiff received no contact or feedback from Defendants with regards to treating

psychiatrist's Dr. Frank's letter regarding workplace accommodations in direct relation to her disabling condition.

54. On around June 30, 2020, treating psychiatrist Dr. Cervone also emailed GOULIAMBERIS a letter requesting that Plaintiff be granted reasonable accommodations. This email was sent to not only GOULIAMBERIS, but also to the Plaintiff, Director of Talent Development Human Resources Defendant DOLPH and Dr. Frank.

55. Defendants failed to engage in an interactive dialogue with Plaintiff in response to Plaintiff's and Plaintiff's psychiatrist's requests for reasonable accommodation.

56. On around July 1, 2020, GOULIAMBERIS responded to Dr. Cervone's email and confirmed receipt. She also included VP of Human Resources Defendant DE RANCOGNE, Director of Human Resources Defendant EINER but removed Defendant DOLPH from the email response. Defendant GOULIAMBERIS stated that she would review the email and get back to Dr. Cervone if she had any questions.

57. On around July 2, 2020, Plaintiff emailed GOULIAMBERIS her employee comments in response to the written warning. Plaintiff did not sign the written warning but signed her name on the letter attached to her comments.

58. On around July 7, 2020 GOULIAMBERIS responded to Plaintiff's email and stated that she would like to meet to discuss the employee comments and the request for reasonable accommodations. Plaintiff was given three potential dates including on that day, so Plaintiff chose to meet with GOULIAMBERIS that day.

59. That day, around July 7, 2020, Plaintiff and GOULIAMBERIS discussed the employee comments but scheduled a future meeting to discuss the accommodations.

60. On around July 13, 2020, GOULIAMBERIS and Plaintiff discussed Dr. Cervone's letter and

shortly thereafter Plaintiff informed Defendant that she was filing a request for short term disability leave.

61. Around July 17, 2020 was Plaintiff's first day of short-term disability leave.

62. In around January 2021, Plaintiff emailed Human Resources contact DAVIS to coordinate her return to work. DAVIS confirmed that Plaintiff would return to work around February 3, 2021. Plaintiff told DAVIS that she had a medical procedure scheduled for that day so her first say was scheduled for the following day, around February 4, 2021.

63. DAVIS asked for a letter from Dr. Cervone after Plaintiff told her that she was advised to start out working from home rather than in the office. GOULIAMBERIS was copied on that email and approved the arrangement.

64. On around February 4, 2021, Plaintiff was online with DAVIS and reported that she still had a few medical appointments pending and asked how she should proceed. DAVIS told Plaintiff to mark them as sick leave in the system.

65. On around February 5, 2021, GOULIAMBERIS asked Plaintiff if she had any work restrictions. Plaintiff said that she was unsure but referred to accommodations requested in the letter from Dr. Cervone and asked if those accommodations could be granted. GOULIAMBERIS responded, "NO, THEY ARE UNDER REVIEW. THEY HAVE NOT BEEN APPROVED. YOU NEED TO SUBMIT A NEW LETTER FROM DR. CERVONE REQUESTING WORKPLACE ACCOMODATIONS."

66. On around February 8, 2021, KIM scheduled a meeting, supposedly with just the Plaintiff. GOULIAMBERIS joined in and they proceeded to issue Plaintiff a "Final Warning."

67. Later that day, on around February 8, 2021, Plaintiff emailed Defendant KENDALL (now Executive Vice President) and requested a meeting to address KIM's refusal to grant any

reasonable accommodations. Defendant KENDALL did not respond to the email.

68. On around February 9, 2021, KENDALL emailed Plaintiff and promised to set up a priority meeting in the next 1-2 days.

69. On around February 11, 2021, because Plaintiff had not heard from her superiors, Plaintiff emailed GOULIAMBERIS and attached a letter, informing GOULIAMBERIS about KIM's failure to grant reasonable accommodation, harassment, discrimination and retaliation that continued unrelenting.

70. A few hours later, Plaintiff received an email from KENDALL which confirmed a meeting for the following day and expressed that someone from Human Resources would also be present in light of Plaintiff raising issues regarding her disability.

71. On around February 12, 2021, Plaintiff joined the meeting that KENDALL arranged along with GOULIAMBERIS and DE RANCOGNE. KENDALL was not a part of the meeting as expected. During this meeting, Plaintiff reiterated the fact that KIM and the Human Resources Department failed to grant reasonable accommodations as a result of her documented disability and confirmed that she was still a target of harassment, discrimination and retaliation from Defendant KIM. Plaintiff again reiterated that she had been in mental health treatment, that she was on disability leave as a result of her disability and that her psychiatric medications were increased as a result of Defendant's negligence, failures to accommodate Plaintiff's disability, and continued retaliation and discriminatory treatment.

72. During this meeting, Plaintiff also highlighted the fact that as a result of the issuance of the "final warning", she was now not entitled to employee allowance, benefits, discounts on products and so forth. Moreover, during this meeting, Defendant DE RANCOGNE interrogated Plaintiff with questions such as, "ARE YOU STILL CONTINUING TO

BELIEVE THAT YOU ARE A VICTIM OF THESE 3 ELEMENTS? HARASSMENT, DISCRIMINATION AND RETALIATION?"

73. During this meeting, Plaintiff mentioned that she had received no response from Human Resources or Defendant KIM even after confirming her disability and noted that both Plaintiff and her treating psychiatrist requested reasonable workplace accommodations in writing.

74. DE RANCOGNE and GOULIAMBERIS, during this call, and after Plaintiff pointed it out, confirmed that one of their responses to Plaintiff's request for reasonable accommodations was for Plaintiff to simply "WORK IT OUT" with Defendant KIM. Further, Plaintiff described other instances where Defendant KIM had targeted her and treated her differently in comparison to her coworkers who did not suffer any known disabilities.

75. Plaintiff provided two non-exhaustive examples; one where she was taking notes on her phone during an in-person meeting. A coworker, Dennis, was also taking notes during the meeting, but on his laptop. Defendant KIM, interrupted the meeting, and openly and intentionally shamed and attempted to humiliate Plaintiff in front of her colleagues by announcing, "SUZAN, PUT YOUR PHONE AWAY!" Defendant KIM, then emailed Dennis later, politely and privately instructing him to put away his laptop.

76. Shortly thereafter, Defendant KIM approached Plaintiff in front of other employees and said Plaintiff: "ARE YOU TRULY COMMITED TO YOUR ROLE? ARE YOU TRULY COMMITTED TO YOUR TEAM? YOUR JOB?"

77. Plaintiff asked Defendant KIM why she treated her differently over Dennis. Defendant KIM responded: "I DO TREAT YOU DIFFERENTLY THAN DENNIS. I MICORMANAGE YOU MORE THAN DENNIS."

78. Defendants never granted Plaintiff's requests for reasonable accommodation for a period

starting in around January 2020 through approximately February 2021.

79. As it became apparent that Defendants had no intention of taking any substantive steps to engage in a meaningful interactive process regarding any accommodations for Plaintiff's disability, and demonstrated no intentions to grant any accommodation over a period for over a year, during which time Defendant KIM's abusive, demeaning, discriminatory and retaliatory conduct against Plaintiff exacerbated the symptoms of her disability, Plaintiff came to the conclusion that in order to mitigate the impact from Defendant's failure to grant reasonable accommodation as well as Defendant KIM's overt acts of hostility toward Plaintiff, Plaintiff had no other choice than to leave the company.

80. Defendants constructively terminated Plaintiff's employment.

81. At the time Defendants constructively terminated Plaintiff, Plaintiff's annual salary was approximately $116,000.00, inclusive of bonuses and benefits.

82. Defendants discriminated against and terminated Plaintiff because of disability, and because she complained of disability discrimination, retaliation and a hostile work environment.

83. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

84. As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments including extreme anxiety and severe depression.

85. As a result of Defendants' unlawful and discriminatory actions, Plaintiff became so physically and emotionally distressed that she is having difficulty eating and sleeping, requiring medical and mental health treatment, including medication.

86. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured

unwarranted financial hardships and irreparable damage to her professional reputation.

87. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation, which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

88. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against all Defendants, jointly and severally.

89. Plaintiff claims constructive discharge.

90. The above are just some of the examples of unlawful, discriminatory, and retaliatory conduct to which Defendants subjected Plaintiff.

91. Defendants' conduct constitutes a continuing violation. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER**
**THE AMERICANS WITH DISABILITIES ACT**
**(Not Against Individual Defendants)**

92. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

93. Plaintiff claims Defendants CHRISTIAN DIOR and LVMH violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

94. SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

95. Section 102 continues: "As used in subsection (a) of this section, the term 'discriminate against a qualified individual on the basis of disability' includes … (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."

96. Defendants CHRISTIAN DIOR and LVMH violated the section cited herein by creating and maintaining discriminatory working conditions, and otherwise discriminating and retaliating against the Plaintiff because of Plaintiff's associated disability.

97. Defendants CHRISTIAN DIOR and LVMH violated the above and Plaintiff suffered numerous damages as a result.

**AS A SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER**
**THE AMERICANS WITH DISABILITIES ACT**
**(Not Against Individual Defendants)**

98. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

99. SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

100.   Defendants CHRISTIAN DIOR and LVMH violated the above and Plaintiff suffered numerous damages as a result.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## NEW YORK STATE LAW
## (Against All Defendants)

101. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

102. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

103. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of Plaintiff's mental health condition, harassing Plaintiff, and causing a hostile work environment.

104. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

105. Defendants violated the above and Plaintiffs suffered numerous damages as a result.

## AS A FORTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## NEW YORK STATE LAW
## (Against All Defendants)

106. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

107. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

108. Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff.

109. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A FIFTH CAUSE OF ACTION
## FOR AIDING AND ABETTING UNDER
## NEW YORK STATE LAW
## (Against All Defendants)

110. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of the complaint.

111. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

112. Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

113. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE
## (Against All Defendants)

114. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

115. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

116. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against the Plaintiff because of Plaintiff's associated disability.

117. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

118. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SEVENTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE
## (Against All Defendants)

119. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

120. The New York City Administrative Code Tide 8, §8-107(1)(e) provides that it shall be

unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

121. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

122. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AN EIGHTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Against All Defendants)**

123. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

124. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

125. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

126. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A NINTH CAUSE OF ACTION
## FOR INTERFERENCE UNDER
## <u>THE NEW YORK CITY ADMINISTRATIVE CODE</u>
## <u>(Against All Defendants)</u>

127. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

128. Section 8-107(19), entitled "Interference with protected rights" provides that "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

129. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A TENTH CAUSE OF ACTION
## FOR SUPERVISOR LIABILITY UNDER
## <u>THE NEW YORK CITY ADMINISTRATIVE CODE</u>
## <u>(Against All Defendants)</u>

130. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

131. Section 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section." b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the

employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

132. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, lost wages, back pay, front pay, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Date: August 19, 2021
New York, New York

Respectfully Submitted,

**DEREK SMITH LAW GROUP, PLLC**

Seamus P. Barrett, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760